# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# SHERMAN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| V. | § | CASE NO. 4:15CR176 |
| | § | |
| MICHAEL ALLEN TEER | § | |

## REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

On January 12, 2016, the Court held a hearing on Defendant's Motion to Suppress Evidence (Dkt. 28). The parties were permitted to submit post-hearing briefing as well as a transcript of the interview at issue. Having considered the evidence presented and the post-hearing transcript and briefing, including a supplemental Motion to Suppress Statements (Dkt. 52), the Court recommends that the motion to suppress (Dkts. 28 and 52) be GRANTED in part and DENIED in part.

Defendant is charged in this case with the offense Receipt of Child Pornography in violation of 18 U.S.C. §§ 2252 and 2252A.

Defendant seeks to suppress the majority of his statements given to law enforcement who were executing a search warrant at his home on September 3, 2015. *See* Dkt. 52.[1] Specifically, Defendant asks that Page 4, Line 17 through Page 72, Line 19 of Docket Entry 48-1, the transcript of the September 3, 2015 interview, be suppressed. *See* Dkt. 52 at 1. Defendant argues that the

---

[1]Although Defendant's originally filed motion also stated that he sought to suppress "all items seized pursuant to those statements by Special Agent Jester with the Department of Homeland Security, Homeland Security Investigations, and Denton Police Department on September 3, 2015," (*see* Dkt. 28 at 1) those items have not been identified for the Court nor were they included in Defendant's supplemental suppression motion (*see* Dkt. 52) which was filed in response to the Court's directive to set forth what specific tangible evidence and statements Defendant sought to suppress. *See* Dkts. 39, 45, 49 & 52.

interview constituted a custodial interrogation in violation of the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution.

The Government responds that Defendant voluntarily gave a statement to law enforcement at his home during the execution of a search warrant at Defendant's home. According to the Government, Defendant was not arrested after giving the statements and was not in custody when he voluntarily made the statements to law enforcement.

The Court notes that "[a] violation of *Miranda* rules, rules fashioned to secure the Fifth Amendment's privilege during custodial interrogation, necessitates only the exclusion of testimonial evidence from the prosecution's case in chief" and not any non-testimonial physical evidence obtained as a result of the interrogation. *United States v. Bengivenga*, 845 F.2d 593, 600 (5th Cir. 1988). Therefore, even if the Court finds a *Miranda* violation as to the interview, the images of child pornography forming the basis of this suit as well as any items seized during the execution of the unchallenged search warrant would not be excludable. *Id.* The Court's analysis is thus limited to suppression of the statements made.

**EVIDENCE PRESENTED**

At the hearing, the Government offered the testimony of Scott Salazar with the Denton Police Department. Salazar testified that he was made aware of a report by Defendant's wife, Canda Teer, that she had discovered child pornography on Defendant's old cell phone. Apparently, the old phone was to be used as an entertainment device for Defendant's child and his wife observed child pornography on it.

Salazar subsequently received a search warrant for the cell phone, and there were videos containing child pornography on the phone. Salazar then obtained a search warrant for Defendant's home in Argyle, Texas from a Denton County District Judge.[2] Salazar testified that he executed the search warrant for Defendant's home on September 3, 2015.

According to Salazar, on the date the warrant was executed, officers encountered Defendant outside of the house. They did so for officer safety because it was reported that Defendant had a temper and was in possession of a handgun. Salazar testified that he was wearing khaki pants and a polo shirt with a Denton Police Department insignia on it. The other two detectives with him were also not in raid gear, and no weapons were pulled when Defendant was stopped.

Salazar testified that he introduced himself to Defendant and placed Defendant into handcuffs for officer safety. Salazar testified that although does not do this with every search warrant, based on the offense report indicating that Defendant had a temper and a weapon, Defendant was handcuffed. According to Salazar, he explained to Defendant that he was being handcuffed for officer safety.

According to Salazar, once Defendant was handcuffed, Salazar asked him questions about who was in the house and some questions about some chairs outside of the house. Salazar testified that he did not want neighbors to be watching and "getting the wrong idea" and tried to shield Defendant from the view of his neighbors by moving him to the driveway. Salazar testified that he told Defendant he was not under arrest and that had no intent of arresting Defendant that day because he was not sure at that point whether Defendant had loaded videos on the phone.

---

[2]Defendant does not challenge the issuance of the search warrant in his motion to suppress.

Agent Mike Jester with Homeland Security arrived to assist in the interview of Defendant inside the house and the handcuffs were removed. According to Salazar, Salazar, Jester and Defendant sat at the kitchen table.

Salazar testified that Defendant was not physically restrained and his movements were not impeded in any way. According to Salazar, although only he, Jester and Defendant were at the kitchen table, approximately 10 other officers were in and out of the house while executing the search warrant. Salazar further testified that none of the officers who arrived to execute the search warrant were dressed in raid gear, pulled any weapons, or had any interaction with Defendant.

Salazar characterized their conversation as "calm" and "cordial." According to Salazar, both he and Jester were smaller than Defendant, never physically intimidated or threatened Defendant, and did not brandish their weapons or raise their voices. Salazar further testified that Defendant did not appear to be under the influence of alcohol or narcotics, was cooperative, and never indicated that he wanted the questioning to stop. As to whether Defendant asked for a lawyer, Salazar testified that Defendant did not say that he wanted to stop to speak to a lawyer.

According to Salazar, nobody told Defendant on the day in question that he was under arrest; instead he was told several times, including when officers left, that he was not under arrest. Salazar conceded that he used several interrogation techniques to make Defendant feel comfortable and feel at ease so he would provide the full story to officers.

Salazar testified that he recorded his entire conversation with Defendant from the moment he exited his vehicle until the moment he left Defendant's home. At the hearing on Defendant's motion to suppress, the audio recording of the conversation with Defendant was admitted in full into

4

evidence. It is approximately 1 hour in length, and only a few excerpts of the audio recording were played at the hearing.

At the conclusion of the hearing, to assist the Court's in its review of the audio recording submitted, the Court directed the Government to submit a written transcript of the audio recording. That transcript was submitted for purposes of the hearing only as an *ex parte* document under seal, and Defendant's counsel was provided a copy. *See* Dkt. 48-1. A transcript of the suppression hearing was also filed. *See* Dkt. 41.

## SUPPRESSION STANDARD

The Fifth Amendment protects an individual's right to be free from compelled self-incrimination. Thus, the Government may use at trial only those confessions that are voluntarily made. 18 U.S.C. § 3501(a); *Malloy v. Hogan*, 378 U.S. 1, 6, 84 S. Ct. 1489, 12 L. Ed. 2d 653 (1964). To protect this right, statements obtained during a custodial interrogation of an accused cannot be used unless the accused has been advised of his right to remain silent and right to counsel. *Miranda v. Arizona*, 384 U.S. 436, 473 (1966). The requirement of *Miranda* that police advise an accused of his rights prior to questioning applies only if the accused is "in custody or otherwise deprived of his freedom of action in any significant way." *Id*. at 445; *Stansbury v. California*, 511 U.S. 318, 322, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994). The determination of whether a person is in custody for *Miranda* purposes must be made on a case-by-case basis considering all the objective circumstances. *Stansbury*, 511 U.S. at 323, 114 S.Ct. 1526. A suspect is "in custody" for the purposes of *Miranda* "when placed under formal arrest or when a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of

the degree which the law associates with formal arrest." *United States v. Courtney,* 463 F.3d 333, 337 (5th Cir. 2006) (quoting *United States v. Bengivenga*, 845 F.2d 593, 596 (5th Cir. 1988)).

"[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis,* 446 U.S. 291, 100 S. Ct. 1682, 1689–90, 64 L. Ed.2d 297 (1980). As such, when the subject of the questioning transformed from routine questioning to questions calculated and intended to elicit a criminally incriminating response, an interrogation is considered to have commenced for purposes of *Miranda*. *See id.*; *see also U.S. v. Chavira*, 614 F.3d 127, 133, n8 (5th Cir. 2010).

A court makes two discrete inquiries when determining whether an individual is in custody "first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave." *United States v. Wright*, 777 F.3d 769, 774 (5th Cir.) cert. denied, 135 S. Ct. 2821, 192 L. Ed. 2d 860 (2015). Although no one factor is determinative, courts consider the following in determining whether an individual was in custody for purposes of *Miranda*: (1) the length of the questioning; (2) the location of the questioning; (3) the accusatory, or non-accusatory, nature of the questioning, (4) the amount of restraint on the individual's physical movement; and (5) statements made by officers regarding the individual's freedom to move or leave. *United States v. Wright*, 777 F.3d 769, 775 (5th Cir. 2015) (collecting cases). "[M]indful that no single circumstance is determinative" and that there are "no categorical determinations" in determining whether an

interrogation was custodial, the Court proceeds with its analysis of the September 3, 2015 interview. *United States v. Cavazos*, 668 F.3d 190, 195 (5th Cir. 2012).

## ANALYSIS

Having considered the testimony presented, the Court finds that there was a *Miranda* violation here but will not extend its implications to the extent Defendant has argued. In light of the facts and circumstances of this case, the Court treats the time period during which Defendant was handcuffed outside of the house and the time period he was not in handcuffs at his kitchen table as two separate interrogations.

As to the time period Defendant was handcuffed, although the stated purpose was for officer safety in order to secure the house during the execution of the search warrant, the Court finds that there was a custodial interrogation. "Custodial interrogation is questioning initiated by law enforcement officers after a person has been taken into custody." *United States v. Wright*, 777 F.3d 769, 774 (5th Cir. 2015).

The audio and written transcript of the interview contains the following exchange shortly after Defendant is placed in handcuffs and moved to the side of the house out of the view of neighbors:

DETECTIVE SALAZAR: Hang out right there. That's good. And I don't think any of this will take too long once we start sitting down talking. And I want you to understand right now that, you know, you're not being arrested. All right. We're going to be leaving here. You know, when we're done talking, we're leaving. And you're going to stay here and continue the rest of your day. All right? I hope that puts you at ease a little bit.

MR. TEER: It does, somewhat.

| | |
|---|---|
| DETECTIVE SALAZAR: | Good. Good. Good. Good. |
| MR. TEER: | I'm still very confused. |
| DETECTIVE SALAZAR: | Um, **do you have any idea why we might be here?** |
| MR. TEER: | No. |
| DETECTIVE SALAZAR: | Okay. **Why -- why do you think we're here?** |
| MR. TEER: | I'm not sure I should disclose that. |
| DETECTIVE SALAZAR: | Well, and -- and here's --here's the deal. You know, I'll -- I'll tell you what -- a little bit. You know, we've got the phone. Okay. And I called Stephanie -- what's the therapist's name from New Counseling Solutions? |
| AGENT JESTER: | Thurston. |
| DETECTIVE SALAZAR: | Thurston. Okay. I sent a subpoena off so I've -- I've done some talking and some reading. And so you talking to me actually is in your best interest because this is going to be one or two ways in the very end. You're going to look like someone who somebody needs to be fearful of, or someone who just needs some help. Personally, I think you're just somebody who needs some help, but I won't know that unless you talk to me. You know, no one said you're going to have to. But like I said, you know, if you don't, I just work on what I have. And I hate to paint you as the type of guy that the community should be worried about. Someone that's going to continue doing -- making mistakes over and over again. I don't think that's what you are. I think what we're dealing with here is simply just a lapse of -- of judgment. And you talking to me helps it paint that portrait. Is it making sense? |
| MR. TEER: | Yes, sir. |
| DETECTIVE SALAZAR: | Okay. |
| MR. TEER: | Yeah, that makes sense. |
| DETECTIVE SALAZAR: | Even your demeanor right now is -- is going a long way in my book. Because you're being very cooperative. You know, I've been |

| | |
|---|---|
| | out to some of these things where people are yelling and screaming. And in the end it -- it just makes me think, okay, that person -- I had something to worry about. |
| MR. TEER: | I'm sorry. I'm listening. |
| DETECTIVE SALAZAR: | They will be in and out and then you and I will sit in there and then we'll talk about the phone. **And I have a feeling you know what I want to talk about in reference to the phone don't you?** |
| MR. TEER: | Yeah. |
| DETECTIVE SALAZAR: | You know, really primarily when we're in there I want to figure out where the -- the videos were from. I understand it's the JBL is where they're from -- |
| AGENT JESTER: | Let's clear this real quick. |
| (Pause) | |
| DETECTIVE SALAZAR: | So, we know a lot. Okay. And you just being up front and honest helps you tremendously. And like I said, I have no reason to believe you're not going to be. Right now you seem like you're really going to be -- you're going to be open and honest with me, and it's going to help you and us. Okay? |
| MR. TEER: | Okay. Okay. |

Dkt. 48-1 at 4-6 (emphasis added).

Although Salazar told Defendant "you're not being arrested" and "We're going to be leaving here.... And you're going to stay here and continue the rest of your day," Defendant was physically restrained in handcuffs. Dkt. 48-1 at 4. And, although Salazar characterizes Defendant's demeanor as cooperative, Defendant initially expresses confusion as to what is happening and even states "I'm not sure I should disclose that" in response to why officers might be there.

9

"[S]tatements made in different circumstances will have different meanings and differently affect the coercive element against which *Miranda* seeks to protect" such that statements that interview is "non-custodial" are relevant but not determinative and should be "analyzed for their effect on a reasonable person's perception, and weighed against opposing facts." *United States v. Cavazos*, 668 F.3d 190, 195 (5th Cir. 2012). "The *awareness* of the person being questioned by an officer that he has become the 'focal point' of the investigation, or that the police already have ample cause to arrest him, may well lead him *to conclude, as a reasonable person,* that he is not free to leave, that *he has* been significantly deprived of his freedom." *United States v. Bengivenga*, 845 F.2d 593, 597 n.16 (5th Cir. 1988) (emphasis in original). Both the subjective belief of the suspect and the unrevealed subjective intent of the law enforcement officer and are irrelevant to the custody determination. *United States v. Bengivenga*, 845 F.2d 593, 597 (5th Cir. 1988).

No reasonable person in handcuffs standing next to at least one police officer would have felt he "was at liberty to terminate the interrogation and leave." *United States v. McNair*, 444 F. App'x 769, 770 (5th Cir. 2011) (citing *Thompson v. Keohane*, 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995)). *See also United States v. Ortiz*, 781 F.3d 221, 231 (5th Cir. 2015) (discussing *Cavazos* and noting that "the fact that the agents eventually handcuffed him would suggest to a reasonable person that he was not free to leave."). The exchange was not a casual non-accusatory exchange outside the house to pass time while the officers cleared the house. Salazar's questions regarding why officers were there, coupled with his references to the phone and its contents and other comments, including "we know a lot," were reasonably likely to elicit an incriminating response from Defendant – while he was physically restrained – regarding his possession of child

pornography. *Rhode Island v. Innis,* 446 U.S. 291, 100 S. Ct. 1682, 1689–90, 64 L. Ed.2d 297 (1980). Such is not permissible under *Miranda*, and any statements made by Defendant while he was handcuffed should be suppressed.

The Court next turns to the interview of Defendant inside his house. It is undisputed (indeed it can be heard on the audio recording and is reflected in the transcript) that Defendant's handcuffs were removed once Defendant was inside his home and during the majority of Salazar and Jester's interview of Defendant.

The Court recognizes that the mere fact that the officers removed the handcuffs did not automatically stop the custodial nature of the interrogation. *United States v. Cavazos*, 668 F.3d 190, 195 (5th Cir. 2012) ("While the handcuffs were removed prior to interrogation, the experience of being singled out and handcuffed would color a reasonable person's perception of the situation and create a reasonable fear that the handcuffs could be reapplied at any time."). The inquiry remains whether the totality of the circumstances would indicate to a reasonable person that, once the handcuffs were removed, Defendant was not free to leave.

Having reviewed the transcript of the conversation, the Court finds that, once the handcuffs were removed, a reasonable person would have felt free to leave and Defendant was no longer in custody for purposes of *Miranda*. As testified by Salazar, Defendant could have declined to speak to officers and could have remained in the house as long as he did not interfere with the execution of the search warrant. As indicated by the Government's transcript:

DETECTIVE SALAZAR: Could we get these cuffs off of him once we sit him down?
(Pause)

| | |
|---|---|
| DETECTIVE SALAZAR: | All right. Just come sit down. You want to sit at the table here? |
| MR. TEER: | That would be great. |

(Background noise)

| | |
|---|---|
| DETECTIVE SALAZAR: | There's my black folder. It's in the back seat. |
| AGENT JESTER: | I'll bring it in. |
| DETECTIVE SALAZAR: | Okay. Thank you. Michael, as I was saying, you know -- take those cuffs off. The reason we had those cuffs on is just for safety reasons. It's first -- **so now they are off** and, you know, I want you to know that our talk today is voluntary. As I said before, you seem very reasonable. It seems like you're open to talking and seems like you want to talk. It seems like you want to help yourself. |
| MR. TEER: | I'm scared but I'm -- |
| DETECTIVE SALAZAR: | Let me try to alleviate those fears. A lot of times it helps -- because when people tell me they are scared, if I try to calm them down a bit. And I'll tell you what, you're going to be in control of our conversation. Okay? You're going to be in control. So at any point in time you tell me, you know what, I -- I'm done, or I don't want to talk, that's okay. Then I'll stop talking to you. Because I want to make sure that you're as comfortable as you possibly can be. Because in order to get a better feel for you, a better understanding -- for me to get to know you, I want to make sure that you're comfortable. Does that make sense? |
| MR. TEER: | Sure. |
| DETECTIVE SALAZAR: | Okay. Do you feel comfortable now with me -- or as much as you can? |
| MR. TEER: | Yeah. Yeah. I'm willing to talk to you guys. |

Dkt. 48-1 at 10-11.

Defendant clearly stated his willingness to speak to officers once inside his home and after the handcuffs were removed, and the conversation was voluntary. The Court notes that the handcuffs were removed near the time that Defendant agreed to talk to the officers. This does not alter the Court's analysis. Salazar had already asked for them to be removed and, having listened to the recording, the Court finds nothing coercive about the removal of the handcuffs in this case.

The conversation has been characterized it as cordial, and the recording indicates a cooperative and respectful tone. No officers brandished weapons and there is no evidence Defendant was threatened in any non-verbal way. At the conclusion of the interview is the following exchange:

| | |
|---|---|
| DETECTIVE SALAZAR: | Mr. Teer, you know, its never a very pleasant time to have to talk to us about any kind of investigation, so I hope while we spoke you at least felt somewhat as relaxed as someone could be. |
| MR. TEER: | All right. I guess -- |
| DETECTIVE SALAZAR: | I didn't come off as aggressive or -- |
| MR. TEER: | No, no. |
| DETECTIVE SALAZAR: | Okay. Good. |
| MR. TEER: | It scared me when you walked up quite aggressively, but sitting here I felt like you showed me respect. |
| DETECTIVE SALAZAR: | Good. |
| MR. TEER: | And I feel like it's given me, you know, a little bit of ability to speak to you in that term. |

Dkt. 48-1 at 69-70.

Even Defendant's own statements make a clear distinction between the time he was handcuffed outside and the time he was sitting unrestrained inside.

The Court has also considered the amount of restraint on Defendant's physical movement and statements made by officers regarding his freedom to move or leave once the handcuffs were removed. Once inside the house, Salazar clearly told Defendant that their talk was voluntary and that Defendant was in control of it and could stop it at any time. Dkt. 48-1 at 9. Jester also asked Defendant whether he needed to call his work and let his employer know he was going to be late. Dkt. 48-1 at 11. The officers' statements clearly indicated that Defendant was not under arrest and would indicate to a reasonable person that he was not in custody. *United States v. McNair*, 444 Fed. App'x 769, 770 (5th Cir. 2011) (relying on the fact that officers told the defendant that "he was not under arrest" and was "free to leave" to support a finding that interrogation was non-custodial).

As to his movement in his house during the execution of the search warrant, Jester told Defendant:

AGENT JESTER: Sure. At any time. The way this kind of works is you're -- you're kind of free to move about, other than we do have the search warrant for the place. We kind of have to control your movements. If you've got to go pee, we kind of follow you around, that kind of stuff. But we don't want you to feel like you're in custody or anything like that because you're not. Okay? Right now we're just talking.

Dkt. 48-1 at 12.

Although Defendant was told that his movements inside the house would be "kind of" controlled, Jester explained that was because of the execution of the search warrant; it was not because Defendant was not free to leave. Moreover, there is no indication here that Defendant's movement was monitored or restrained in any way after the handcuffs were removed and while he sat with officers at the kitchen table. *Cf. Cavazos*, 668 F.3d at 194 (pointing out that defendant was "followed and monitored" when he tried to go to the bathroom); *Chavira,* 614 F.3d at 134 (holding

14

that defendant was in custody where her "freedom of movement was severely restrained" by officers when they confiscated her birth certificate and ID and handcuffed her to a chair).

Further, Defendant was inside his own home and sitting at his kitchen table with plain clothes officers during the non-custodial interview. Although the fact that the conversation occurred inside Defendant's home is not necessarily determinative of whether it was non-coercive, *see Cavazos*, 668 F.3d at 194 (facts that a large number of officers entered a defendant's home, without his consent, early in the morning, and the defendant's subsequent movement about the home was continually monitored weighed against the presumption that an in-home interrogation is non-coercive), the Court finds that it weighs in the Government's favor here.

As to the length of questioning, the questioning outside of the house lasted less than 10 minutes and the questioning inside the house lasted approximately 45 minutes. Although longer than the conversation outside of the house, the conversation inside was not so prolonged that a reasonable person would have concluded that he was not free to leave or go on with his day. *See Wright*, 777 F. 3d at 775 (citing *Harrell*, 894 F.2d at 124 n. 1 (5th Cir. 1990) ("[W]e reject the broad proposition that a short delay constitutes per se a noncustodial interrogation or that an hour-long delay constitutes a per se custodial interrogation. It is but one, albeit important, factor to consider in applying our objective standard outlined in *Bengivenga*.")).

As to the nature of the questions asked, there is no question that Defendant was aware of why he was being questioned or that he was being investigated in conjunction with alleged possession of child pornography. Nonetheless, a review of the transcript also indicates that the officers advised him several times that he would not be arrested that day. They also stated that they were gathering

15

information for their report and that the investigation into him was not going away and could result in charges against him. Dkt. 48-1 at 4, 8, 66-68. Defendant also acknowledged that he was not going to jail that day and asked if officers would let him know whether charges would be filed. Dkt. 48-1 at 65-68. Officers repeatedly noted his honesty and level of cooperation and told him not to be nervous. Dkt. 48-1 at 21, 22, 66, 71. Despite the clear subject matter of their conversation and although it appears that Defendant was aware he was a criminal suspect, taking into consideration the totality of the circumstances, the Court finds Defendant's statements were voluntarily made and not the result of a custodial interrogation.

The Court notes that on several occasions while they sat at the inside table, Defendant stated that he would have to consult a lawyer before answering such questions. *See* Dkt. 48-1 at 23-26. Because the Court finds that the interview inside Defendant's house was not a custodial interview, the Court need not address these whether statements were an unambiguous or unequivocal request for counsel. *See Wright*, 777 F. 3d at 777. In any event, even after he declined to answer a question stating he would talk to an attorney "before I start to talk about specifics," Defendant stated that he was "happy to" continue talking in generalities and told officers he would tell them if he felt uncomfortable answering a question and does tell them on several occasions. Dkt. 48-1 at 23-26. Defendant's references to an attorney thus do not alter the Court's suppression analysis. *See id.* (citing *Griffin v. Lynaugh*, 823 F.2d 856, 863 (5th Cir.1987) ("[W]hen an accused makes an unambiguous but limited request for counsel, in the absence of police interference with the accused's fifth amendment guarantee to counsel, interrogation may proceed after satisfaction of that request."); *United States v. Ivy*, 929 F.2d 147, 153 (5th Cir.1991) (affirming district court's denial of

defendant's motion to suppress where, during the interrogation, the defendant "expressed his unwillingness to answer questions about" a certain topic, and law enforcement "honored this request by moving to a different subject")).

Based on the totality of circumstances of the interview after Defendant and officers entered the home, the Court finds that the post-handcuffed conversation did not violate Defendant's constitutional rights. Defendant was not physically restrained or monitored, Defendant acknowledged that he would be going to work, albeit arriving late, Defendant's tone was cooperative and officers' demeanor and tone would not be considered objectively threatening or coercive.

The Court finds that the questioning of Defendant during the search of the home did not constitute a restraint on freedom of movement of the degree which the law associates with formal arrest. No reasonable person in Defendant's position would have believed that his freedom was so restrained that he was in custody for purposes of *Miranda*. Even if Defendant was not specifically told that he was "free to leave," there is nothing to suggest that he was prevented from leaving; and the search of his home would have been conducted pursuant to the search warrant regardless.

Defendant fails to cite to any authority that would show that the Court cannot treat the interview with Salazar and Jester as two separate "interrogations" for *Miranda* purposes. Indeed, at the suppression hearing, Defendant's counsel characterized the September 3, 2015 interview of Defendant is "kind of a two part deal," with one set of questioning occurring outside in handcuffs and one occurring inside Defendant's home un-handcuffed. Dkt. 41 at 33. And, analogous cases support the Court's analysis here. *See, e.g., Oregon v. Elstad*, 470 U.S. 298, 309, 105 S. Ct. 1285, 1293, 84 L. Ed. 2d 222 (1985) ("It is an unwarranted extension of *Miranda* to hold that a simple

17

failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period."); *United States v. Gonzalez-Garcia*, 708 F.3d 682, 688 (5th Cir. 2013) ("Just as a confession following an unwarned confession may be voluntary, consent following an unwarned confession may be voluntary.").

Although Defendant has argued that the *Miranda* violation during the outside interrogation taints the remainder of the interrogation under a "fruit of the poisonous tree" argument, such is simply not supported by governing authority. *United States v. Bengivenga*, 845 F.2d 593, 601 (5th Cir. 1988) ("[A] mere violation of *Miranda*'s "prophylactic" procedures does not trigger the fruit of the poisonous tree doctrine. The derivative evidence rule operates only when an actual constitutional violation occurs, as where a suspect confesses in response to coercion.").

Because the Court finds that Defendant was not in custody at the time he spoke to Salazar and Jester at his kitchen table, the failure to provide *Miranda* warnings did not require suppression of any of his statements made after the handcuffs were removed. *United States v. Wright,* 777 F.3d 769, 777 (5th Cir.) cert. denied, 135 S. Ct. 2821, 192 L. Ed. 2d 860 (2015) (finding no custodial interrogation where officer repeatedly assured the defendant that he was not under arrest and that he was free to leave; where there was no evidence that the defendant was physically restrained during the interrogation, which took place close to the home, in a car subject to public scrutiny; and where the transcript of the interview, and the cooperative tone throughout, "highlights that the conversation was as much an opportunity taken by [the defendant] to tell his story to the officers as it was an

opportunity taken by the officers to get information from [him].").

For these reasons, the Court recommends that Defendant's Motion to Suppress Evidence (Dkts. 28 and 52) be GRANTED as to any statements made by Defendant while he was handcuffed outside of his home and DENIED as to any statements made after the handcuffs were removed and he voluntarily spoke with officers at his kitchen table.

Within fourteen (14) days after service of the magistrate judge's report, any party may serve and file written objections to the findings and recommendations of the magistrate judge. 28 U.S.C.A. § 636(b)(1)(c).

A party is entitled to a *de novo* review by the district court of the findings and conclusions contained in this report only if specific objections are made, and failure to timely file written objections to any proposed findings, conclusions, and recommendations contained in this report shall bar an aggrieved party from appellate review of those factual findings and legal conclusions accepted by the district court, except on grounds of plain error, provided that the party has been served with notice that such consequences will result from a failure to object. 28 U.S.C.A. § 636(b)(1)(C); *Thomas v. Arn*, 474 U.S. 140, 148 (1985); *Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc), *superseded by statute on other grounds*, 28 U.S.C. § 636(b)(1) (extending the time to file objections from ten to fourteen days).

**SIGNED this 8th day of March, 2016.**

DON D. BUSH
UNITED STATES MAGISTRATE JUDGE